**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: Health Gorilla, Inc., et al., Data Security Breach Litigation** | **MDL No. 3193** |

This Document Relates To:

***Epic Systems Corporation, et al. v. Health Gorilla, Inc., et al.***
Case No. 2:26-cv-00321-FMO-RAO (C.D. California)

# PLAINTIFFS EPIC SYSTEMS CORPORATION, OCHIN, INC., REID HOSPITAL & HEALTH CARE SERVICES, INC., TRINITY HEALTH CORPORATION, AND UMASS MEMORIAL HEALTH CARE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-1)

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT....1

FACTUAL BACKGROUND....4

A. Plaintiffs Sue to Stop the Exploitation of the Interoperability Frameworks....4

B. Patients File Putative Class Actions Alleging a Data Security Breach....6

ARGUMENT....8

A. The Law of the Case in the Fraud Action Prevents Transfer....9

B. The Common Questions of Fact are Limited, Not Complex, and Overshadowed by Unique Questions....10

C. Transfer Will Not Serve the Convenience of the Parties and the Witnesses and Will Not Serve the Just and Efficient Conduct of the Litigations....14

1. Transfer Will Not Serve the Convenience of the Parties and the Witnesses....15

2. Transfer Will Not Serve the Just and Efficient Conduct of the Litigations....16

CONCLUSION....20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accutane Prods. Liab. Litig.*,
560 F. Supp. 2d 1370 (J.P.M.L. 2008)....................14

*In re: Adderall XR (Amphetamine/Dextroamphetamine) Mktg., Sales Pracs. & Antitrust Litig.*,
968 F. Supp. 2d 1343 (J.P.M.L. 2013)....................19

*In re AriZona Beverage Co. Prods. Mktg. & Sales Practices Litig.*,
609 F. Supp. 2d 1369 (J.P.M.L. 2009)....................19

*Arizona v. California*,
460 U.S. 605 (1983)....................9, 10

*In re Axon Enter., Inc., Body-Worn Camera & Digital Evidence Mgmt. Sys. Antitrust Litig.*,
776 F. Supp. 3d 1344 (J.P.M.L. 2025)....................20

*In re Best Buy Co.*,
804 F. Supp. 2d 1376 (J.P.M.L. 2011)....................8

*In re Cessna 208 Series Aircraft Prods. Liab. Litig.*,
655 F. Supp. 2d 1379 (J.P.M.L. 2009)....................14

*In re Cessna Aircraft Distributorship Antitrust Litig.*,
460 F. Supp. 159 (J.P.M.L. 1978)....................10

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988)....................9, 10

*In re COVID-19 Bus. Interruption Prot. Ins. Litig.*,
482 F. Supp. 3d 1360 (J.P.M.L. 2020)....................16, 18

*In re CP4 Fuel Pump Mktg., Sales Practices, & Prods. Liab. Litig.*,
412 F. Supp. 3d 1365 (J.P.M.L. 2019)....................19

*In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*,
446 F. Supp. 242 (J.P.M.L. 1978)....................8, 20

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*,
MDL No. 2785, 2017 WL 11913624 (J.P.M.L. Dec. 5, 2017)....................16

*In re Florida, Puerto Rico, and U.S. Virgin Islands Hurricane Seasons Flood Claims Litig.*,
325 F. Supp. 3d 1367 (J.P.M.L. 2018).....16, 17

*In re Gap, Inc., COVID-19 Lease Payment Litig.*,
492 F. Supp. 3d 1345 (J.P.M.L. 2020).....10

*In re Georgeson Shareholder Coms., Inc., Share Exch. Litig.*,
277 F. Supp. 2d 1372 (J.P.M.L. 2003).....10, 11

*In re Highway Acc. Near Rockville*,
388 F. Supp. 574 (J.P.M.L. 1975).....11

*In re Hyundai & KAI GDI Engine Mkt., Sales, Practices, & Prods. Liab. Litig.*,
412 F. Supp. 3d 1341 (J.P.M.L. 2019).....8

*In re IBM Antitrust Litig.*,
328 F. Supp. 509 (J.P.M.L. 1971).....18

*In re Multidistr. Civ. Antitrust Actions Involving the Distrib. of Scotch Whiskey*,
299 F. Supp. 543 (J.P.M.L. 1969).....8, 13

*In re N.Y. Tax Foreclosure Surplus Litig.*,
743 F. Supp. 3d 1378 (J.P.M.L. 2024).....18

*In re New York Dep't of Corr. & Cmty. Supervision Medications With Abuse Potential Prisoner Litig.*,
709 F. Supp. 3d 1390 (J.P.M.L. 2023).....20

*In re Pharmacy Benefit Managers Antitrust Litig.*,
582 F.3d 432 (3d Cir. 2009).....9

*In re Pork Antitrust Litig.*,
2021 WL 5310590 (D. Minn. Nov. 12, 2021).....9

*In re Prop. Assessed Clean Energy (Pace) Programs Litig.*,
764 F. Supp. 2d 1345 (J.P.M.L. 2011).....15, 17

*In re Prospect Mortg., LLC, Fair Lab. Standards Act (FLSA) & Wage & Hour Litig.*,
987 F. Supp. 2d 1383 (J.P.M.L. 2013).....16

*Pyramid Lake Paiute Tribe of Indians v. Hodel*,
882 F.2d 364 (9th Cir. 1989).....10

*In re Real Est. Transfer Tax Litig.*,
895 F. Supp. 2d 1350 (J.P.M.L. 2012).....16

*In re Royal Am. Indus., Inc. Sec. Litig.*,
407 F. Supp. 242 (J.P.M.L. 1976)....8

*In re Starbucks Corp. Mktg. & Sales Pracs. Litig.*,
222 F. Supp. 3d 1348 (J.P.M.L. 2016)....18, 19

*In re Transocean Ltd. Sec. Litig. (No. II)*,
753 F. Supp. 2d 1373 (J.P.M.L. 2010)....8

**Statutes**

28 U.S.C. § 1407(a) ....8, 9, 10, 11

**Other Authorities**

45 C.F.R. §§ 164.506(a), (c)(2) ....13

45 C.F.R. § 164.506(b)(1)....14

Fed. R. Civ. P. 42....7, 9

Fed. R. Civ. P. 42(a) ....7, 9

## PRELIMINARY STATEMENT

Plaintiffs Epic Systems Corporation ("Epic"), OCHIN, Inc. ("OCHIN"), Reid Hospital & Health Care Services, Inc. d/b/a Reid Health ("Reid"), Trinity Health Corporation ("Trinity"), and UMass Memorial Health Care, Inc. ("UMass Memorial Health") are trusted leaders in healthcare delivery and technology. In January 2026, Plaintiffs filed an action in California against 16 Defendants, 10 entities and 6 of their owners and operators.[1] These Defendants have engaged in fraud on the national healthcare interoperability frameworks—the Carequality and TEFCA frameworks—improperly obtaining private patient medical records from or through Plaintiffs and other treatment providers who are connected through the frameworks.

The Fraud Action is nearly eight months old and well underway, with a scheduling order entered through trial by Judge Fernando M. Olguin of the Central District of California. Plaintiffs have obtained tens of thousands of pages of corroborating evidence in discovery. One Defendant submitted a sworn declaration confirming the veracity of Plaintiffs' claims and Judge Olguin entered a judgment and permanent injunction against another Defendant. Meanwhile, Judge Olguin ruled that the only data security breach action filed in California was not related to, and could not be consolidated with, the Fraud Action. Decl. of Marshall L. Baker in Supp. of Mot. to Vacate ("Baker Decl."), Ex. 2 (*Patterson* Order). The Fraud Action does not belong in this MDL.

The interoperability frameworks are trust-based exchanges that allow healthcare providers nationwide to immediately exchange private medical data with other healthcare providers who are treating patients. As an example, when a patient presents at a hospital's emergency room where she has never been seen, the frameworks enable the hospital to instantly retrieve her clinical records from almost all hospitals and clinics across the country so the care team can make informed

[1] *Epic Systems Corp. et al. v. Health Gorilla, Inc., et al.*, No. 2:26-cv-00321 (C.D. Cal.) (the "Fraud Action").

treatment decisions. Every month, more than one billion documents are exchanged through these frameworks. When used appropriately, the frameworks profoundly enhance the quality of patient care—and dramatically improve patient outcomes—by ensuring that medical care is informed by a patient's documented medical history.

To operate successfully, the frameworks depend on a shared trust—codified across the agreements that govern framework access—that each participant will request and exchange records for permitted purposes only. As relevant to the Fraud Action, the only permitted purpose is the treatment purpose. The reason is simple but important: Once connected to the interoperability frameworks, treatment providers like Plaintiffs Reid, Trinity, and UMass Memorial Health can request and obtain—instantly and without charge—the patient medical records they need to provide effective and timely treatment to a patient during an encounter.

The Defendants in the Fraud Action gained or facilitated access to the interoperability frameworks by falsely representing that they were treatment providers requesting records through the frameworks to treat patients. But their requests were not made for that purpose. Defendants are instead in the business of monetizing patient records, and they abused the frameworks by submitting knowingly false "treatment" queries for those records. In so doing, Defendants broke the law, committed fraud, and breached both the letter and spirit of the framework agreements, undermining the integrity of the frameworks and the public and patient trust placed in them.

The Fraud Action seeks to stop the remaining Defendants from using the interoperability frameworks as data marts where sensitive patient information can be bought and sold. The Complaint asserts claims, including under California statute and common law, based on Defendants' fraud on the frameworks, their knowing and concerted effort to abuse the "treatment" use cases to take patient records for their own commercial gain, and their corresponding breaches

of their contractual obligations to Plaintiffs as framework participants. Plaintiffs seek to enjoin the remaining Defendants from further accessing the interoperability frameworks, the return or destruction of improperly obtained records, and disgorgement of ill-gotten gains.

Put plainly, the Fraud Action is not a "data security breach litigation," and it does not belong in this MDL. The data security breach actions turn on many fundamentally different factual and case-specific questions. Namely, whether the defendants in the data security breach cases—two of whom are Plaintiffs in the Fraud Action—maintained adequate security architectures and measures to protect against unauthorized access to patient data, whether their responses to the alleged security incident were timely and reasonable, and a host of questions relating to the claims of the individual class members regarding access, harm, and causation. Discovery in those cases will be dominated by individual questions of patient-level harm, including, among other things, whether specific class members' data was accessed, what information was accessed, when it was accessed and by whom, and whether each class member experienced a cognizable harm; by expert testimony regarding the standard of care for the protection of personal health information in the context of data security risks; and by issues related to defendants' data-security practices.

The Fraud Action is not about data security architecture and the reasonableness of breach reporting. It addresses intentional lies about the stated purposes for which Defendants accessed patient records from the interoperability frameworks. In other words, the frameworks' exchange mechanisms operated as designed—what was wrong here is that Defendants improperly gained access to and abused the trust-based model those frameworks depend on, breached the framework agreements, and lied about it. Plaintiffs are well on their way to proving their claims.

Respectfully, there is no basis to derail the Fraud Action by lumping it together with a spate of data privacy litigation that has its own set of complicated factual and legal questions to resolve.

Further, transfer will inconvenience the parties and witnesses and delay the efficient resolution of both the Fraud Action and this MDL, which militates against transfer. For the foregoing reasons, and as further detailed herein, Plaintiffs move the Panel to vacate its Conditional Transfer Order (CTO-1) and permit the Fraud Action to proceed in California.

## FACTUAL BACKGROUND

### A. Plaintiffs Sue to Stop the Exploitation of the Interoperability Frameworks.

In its roles on the frameworks, Defendant Health Gorilla serves as a gatekeeper and is responsible for onboarding connections; vetting and validating connections' eligibility to properly assert exchange purposes; and, once onboarded, monitoring and ensuring compliance with the framework agreements. Baker Decl., Ex. 3 (Fraud Action Compl.) ¶¶ 54, 56, 59, 84, 88-89. Instead of doing those things, Health Gorilla intentionally onboarded an interconnected web of entities and the individuals who own and operate them (*i.e.*, the other Defendants in the Fraud Action) and knowingly allowed them to retrieve medical records under the false pretense that they were treating patients when, in reality, they were not. *Id.* ¶¶ 138-183. The scheme works like this:

(1) individuals use closely held entities masquerading as treatment providers—with clinical-sounding names, nonfunctional treatment-related websites, sham NPI numbers, and purported physician or clinician owners—to gain access to the interoperability frameworks;

(2) the entities use their access to query patient records via the interoperability frameworks under the false assertion that they are seeking these records for treatment purposes;

(3) the individuals sell the patient records to third parties (including, for example, lawyers looking for potential claimants with specific conditions and diagnoses that would qualify them to join mass tort lawsuits) through a second, closely held entity; and

(4) when caught, rather than stopping their activities, the individuals create new companies. *Id.* The scheme thus operates like a Hydra: when one fraudulent entity is exposed, the bad actors birth a new one. *Id.*

Plaintiffs, long-standing participants in interoperability efforts, sued to stop this and have been proceeding apace against the backdrop of the Court's Scheduling Order, which requires that

fact discovery be completed by May 6, 2027, expert discovery be completed by July 22, 2027, and trial set for January 2028. Baker Decl., Ex. 4 (Scheduling Order). The parties have fully briefed multiple motions to dismiss and executed a Stipulated Protective Order and Stipulation Regarding Discovery of Electronically Stored Information, both of which are Court-ordered and govern the discovery proceedings in the Fraud Action (as opposed to the eventual discovery orders to be reached in the MDL). *See generally* Baker Decl., Ex. 7 (Fraud Action Dkt.). Plaintiffs have served Requests for Production on Defendants and have propounded more than two dozen documents subpoenas. Discovery has yielded thousands of documents and other information corroborating Plaintiffs' allegations, including that Defendants were working hand-in-hand with law firms and querying records via the frameworks for those firms. For example, Defendant Mammoth admitted that one of its investors is a personal injury lawyer, who, as confirmed by documents produced in discovery, was also working with Defendants Unit 387 and GuardDog to retrieve patient records via the frameworks for use by his firm. Discovery also confirmed that Health Gorilla was aware of and ignored red flags related to the Defendants. For example, instead of preventing GuardDog from accessing the framework due to its business model of serving law firms, Health Gorilla simply told GuardDog to strip all references to its legal work from its public-facing website.[2]

In addition, Judge Olguin entered a Stipulated Judgment and Permanent Injunction against Defendant GuardDog after it admitted that it misused the Carequality framework to request patient records using a "treatment" purpose—even though it never provided treatment to patients and was instead requesting patient records for mass tort law firms. Baker Decl., Ex. 5 (Judgment) ¶¶ 5-6. GuardDog also admitted that its co-schemer Defendant Unit 387 was requesting patient records

[2] This memorandum, of course, does not describe the copious material evidence that Plaintiffs have obtained thus far through party discovery and nonparty subpoenas which has been designated "Confidential" or "Highly Confidential – Attorneys' Eyes Only" under the Fraud Action's Protective Order.

via the Carequality framework by falsely asserting that it was a GuardDog predecessor entity that required the records for treatment. *Id.* ¶ 8.[3]

Then, Martin Hensel, founder of Defendant SelfRx, executed a sworn declaration confirming misconduct on the frameworks. *See generally* Baker Decl., Ex. 6 (Hensel Decl.). Mr. Hensel attested that SelfRx was onboarded to the Carequality framework through Health Gorilla and Unit 387 and requested records through the Carequality framework for only 21 patients, receiving less than 100 records total. *Id.* ¶¶ 7-8. Yet SelfRx's Carequality directory entry was used to take many more medical records from Epic's customers, the majority of which were requested after SelfRx ceased operating. *Id.* ¶ 9. SelfRx disclaimed these requests. *Id.* To be sure, Plaintiffs believe that discovery will show that Unit 387 improperly queried these records, falsely holding itself out as SelfRx—just as Unit 387 did with GuardDog. Baker Decl., Ex. 5 (Judgment) ¶ 8.

### B. Patients File Putative Class Actions Alleging a Data Security Breach.

Twelve putative class actions were filed by individual patients alleging data security breaches and associated failures to properly secure and safeguard patient records against unauthorized access (the "Data Security Breach Actions").[4] The putative classes bring garden variety data security breach claims, including negligence, unjust enrichment, and invasion of

---

[3] Under the terms of the Judgment, the U.S. District Court for the Central District of California maintains continuing jurisdiction over the action for purposes of enforcing the Judgment. Baker Decl., Ex. 5 (Judgment) ¶ 23.

[4] *Banh v. Epic Systems Corp., et al.*, Case No. 3:26-cv-00216 (W.D. Wis.); *Beaudreau v. Epic Systems Corp., et al.*, Case No. 3:26-cv-00215 (W.D. Wis.); *Berry v. Univ. of Ill. Hosp. & Health Sci, System*, Case No. 1:26-cv-04629 (D. Ill.); *Delis v. Health Gorilla, Inc.*, *et al.*, Case No. 1:26-cv-22178 (S.D. Fla.); *Fox v. Epic Systems Corp., et al.*, Case No. 2:26-cv-04678 (C.D. Cal.); *Hawkins, et al. v. Health Gorilla, Inc., et al.*, Case No. 1:26-cv-22328 (S.D. Fla.); *Hughes v. Health Gorilla, Inc.*, Case No. 1:26-cv-21952 (S.D. Fla.); *Jackson v. Trinity Health Corp., et al.*, Case No. 2:26-cv-10948 (E.D. Mich.); *Lott v. Health Gorilla, Inc.*, Case No. 1:26-cv-21639 (S.D. Fla.); *Malenkovich v. Health Gorilla, Inc.*, Case No. 1:26-cv-22757 (S.D. Fla.); *Pabon v. Trinity Health Corp., et al.*, Case No. 2:26-cv-10989-SDK-KGA (E.D. Mich.); and *Patterson v. UVA Health, et al.*, No. 2:26-cv-01938 (C.D. Cal.).

privacy. And in each case, the putative class seeks injunctions requiring certain security measures be implemented and certain disclosures be made, as well as monetary damages to compensate the putative class members for the alleged harms suffered by them due to the alleged security breaches.

One of the first Data Security Breach Actions—*Patterson v. UVA Health, et al.*, No. 2:26-cv-01938 (C.D. Cal.)—was filed in the same district as the Fraud Action. Judge Olguin, who presides over the Fraud Action, was asked to determine whether *Patterson* was related to, and thus could be consolidated with, the Fraud Action pursuant to Rule 42. Baker Decl., Exs. 1 (*Patterson* Request for Consolidation), 2 (*Patterson* Order); Fed. R. Civ. P. 42(a). Judge Olguin held that the two cases were not related and declined to transfer *Patterson* to his docket, holding that the Fraud Action and *Patterson* do not "call for the determination of substantially similar or related questions of law or fact." Baker Decl., Ex. 2 (*Patterson* Order) at 2. The Fraud Action "is a complaint filed by entities that provide data sharing tools or healthcare treatment against several defendants contending that they are exploiting interoperability frameworks under the guise of providing healthcare but in actuality are taking patient records for other purposes," while *Patterson* "is a class action brought by and on behalf of individuals whose private information was exposed as a result of a data breach discovered in January 2026." *Id.* Thus, "[w]hile the cases involve some of the same parties, the factual circumstances and defenses will necessarily be different." *Id.*

The Data Security Breach Actions are otherwise in the earliest stages and, in a number of instances, have been terminated—either in full or as to certain parties. Baker Decl., Exs. 10 (*Banh* Dkt.) at No. 19 (dismissed), 12 (*Beaudreau* Dkt.) at No. 7 (same), 18 (*Fox* Dkt.) at No. 48 (same), 14 (*Berry* Dkt.) (stayed, motion to dismiss briefing incomplete), 26 (*Lott* Dkt.) (stayed, no response to complaint filed), 24 (*Jackson* Dkt.) (same), 30 (*Pabon* Dkt.) (same), 32 (*Patterson* Dkt.) (certain defendants have moved to dismiss and others have not yet responded to the complaint).

## ARGUMENT

Transfer under Section 1407 is appropriate only if (1) the actions share common issues of fact and (2) transfer serves the convenience of the parties and witnesses and advances the just and efficient conduct of the actions. 28 U.S.C. § 1407(a). "[W]here only a minimal number of actions are involved," as here, any proponent of centralization "bears a heavier burden of demonstrating the need for centralization," *In re Transocean Ltd. Sec. Litig. (No. II)*, 753 F. Supp. 2d 1373, 1374 (J.P.M.L. 2010), satisfying the Section 1407 criteria to a greater degree by demonstrating that "the common questions of fact are so complex and the accompanying [common] discovery so time-consuming as to overcome the inconvenience to the party whose action is being transferred and its witnesses." *In re Royal Am. Indus., Inc. Sec. Litig.*, 407 F. Supp. 242, 243 (J.P.M.L. 1976); *In re Multidistr. Civ. Antitrust Actions Involving the Distrib. of Scotch Whiskey*, 299 F. Supp. 543, 544 (J.P.M.L. 1969) (same); *see also In re Best Buy Co.*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011) (applying heavier burden where "more than twenty actions" were involved); *In re Hyundai & KAI GDI Engine Mkt., Sales, Practices, & Prods. Liab. Litig.*, 412 F. Supp. 3d 1341, 1342 (J.P.M.L. 2019) (applying heavier burden where "ten putative class actions" were involved). No matter the number of actions, "centralization under Section 1407 should be the last solution after considered review of all other options," *Best Buy*, 804 F. Supp. 2d at 1378, including "consultation and cooperation among the [ ] concerned district courts" and "cooperation of the parties." *In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978).

Here, transfer of the Fraud Action is not appropriate. As an initial matter, Judge Olguin's Order that the Fraud Action and *Patterson* cannot be consolidated is law of the case which should not be disturbed. This Order—which was not before the Panel when it issued its Conditional Transfer Order—alone should prevent transfer. But even setting aside Judge Olguin's Order,

neither criteria for Section 1407 transfer is met, nor is the heavier burden of demonstrating that the common questions of fact are so complex and the common discovery so time-consuming that the inconvenience of transfer to Plaintiffs and their witnesses is overcome.

**A. The Law of the Case in the Fraud Action Prevents Transfer.**

Pursuant to Rule 42, Judge Olguin denied consolidation of the Fraud Action and *Patterson*, holding that the two actions are not "closely related" and do not "call for the determination of substantially similar or related questions of law or fact." Baker Decl., Ex. 2 (*Patterson* Order) at 2; *id.* ("While the cases involve some of the same parties, the factual circumstances and defenses will necessarily be different"); *see also* Fed. R. Civ. P. 42(a).

Judge Olguin's Order is law of the case. *Arizona v. California*, 460 U.S. 605, 618 (1983) (the "law of the case" provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). The doctrine applies with equal force in the context of multidistrict litigation. *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) ("[T]here is nothing in the rules adopted by the Joint Panel on Multidistrict Litigation that authorizes a transferee judge to vacate or modify the order of a transferor judge."); *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (law of the case "applies as much to the decisions of a coordinate court in the same case as to a court's own decisions, and the policies supporting the doctrine apply with even greater force to transfer decisions than to decisions of substantive law").

Because Rule 42(a) and Section 1407(a) are two sides of the same coin, Plaintiffs respectfully submit that the law of the case doctrine should preclude transfer of the Fraud Action. *See In re Pork Antitrust Litig.*, 2021 WL 5310590, at *3 (D. Minn. Nov. 12, 2021) ("the purposes of forming MDLs through transfer by the JPML under 28 U.S.C. § 1407(a) and the purposes of

Rule 42(a) consolidation are substantially identical"). Judge Olguin's Order should continue to govern and transfer should be denied. *Arizona*, 460 U.S. at 618. And, given the overlap found by this Panel between *Patterson* and the remaining Data Security Breach Actions, *see generally* MDL Dkt. No. 52, there is no basis to reach a different result as to the remaining Data Security Breach Actions. Courts "should be loathe" to revisit a decision "in the absence of extraordinary circumstances," *Christianson*, 486 U.S. at 817, and no extraordinary circumstances exist here. *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989) (extraordinary circumstances include: (1) the availability of new evidence; (2) a change in the law; or (3) clear error causing manifest injustice).

**B. The Common Questions of Fact are Limited, Not Complex, and Overshadowed by Unique Questions.**

Should the Panel set aside Judge Olguin's Order (and it should not), the result is the same because the Section 1407 criteria are not met.

Even if "actions will involve some overlapping factual questions," transfer is inappropriate where "the overlap appears to be limited and overshadowed by the many individual questions." *In re Gap, Inc., COVID-19 Lease Payment Litig.*, 492 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020) (denying consolidation). The common questions of fact must be "sufficiently complex, unresolved and/or numerous[.]" *In re Georgeson Shareholder Coms., Inc., Share Exch. Litig.*, 277 F. Supp. 2d 1372, 1372-73 (J.P.M.L. 2003) (denying centralization). Therefore, "a mere showing that such [common factual] questions exist is not sufficient" on its own. *In re Cessna Aircraft Distributorship Antitrust Litig.*, 460 F. Supp. 159, 161–62 (J.P.M.L. 1978).

Here, "the overlap [is] limited and overshadowed by the many individual questions," *Gap*, 492 F. Supp. 3d at 1346, and the common questions that do exist are not "sufficiently complex,

unresolved, and/or numerous" to warrant transfer. *Georgeson*, 277 F. Supp. 2d at 1372-73. As the Panel long ago recognized, just because actions are spawned by the same factual event "does not ipso facto mean that their coordination or consolidation under Section 1407 is appropriate." *In re Highway Acc. Near Rockville*, 388 F. Supp. 574, 575 (J.P.M.L. 1975) (denying transfer).

***First***, the Data Security Breach Actions center on unique fact questions regarding: (1) whether a particular patient's data was actually accessed, viewed, copied, or exfiltrated; (2) what categories of information were involved, ranging from basic identifying information to Social Security numbers, financial account information, or sensitive medical records; (3) what injuries, if any, the individual patient actually suffered; (4) causation of any alleged harm; and (5) whether any individual patient accepted a governing arbitration agreements with their healthcare providers or others. These questions of fact specific to individual patient records, injury, and causation lie at the heart of the Data Security Breach Actions. They have no relevance to the Fraud Action.

***Second***, the conduct of Epic, Trinity, the University of Illinois Hospital & Health Sciences System, and The Rector and Visitors of the University of Virginia is relevant to the Data Security Breach Actions, but is not at issue in the Fraud Action. To be sure, all fact questions related to the University of Illinois and the University of Virginia are not relevant to the Fraud Action as they are not parties. Even so, if the Data Security Breach Action plaintiffs survive a motion to dismiss, the plaintiffs in those cases have raised fact questions related to whether Epic and the healthcare providers implemented reasonable data safeguards and complied with applicable privacy and security obligations, including questions regarding: (1) the design and administration of the platforms through which patient information was shared; (2) the security controls in place; (3) the adequacy of vendor oversight; (4) the timing and content of breach notifications; and (5) the accuracy of data security representations. None of those issues is relevant to the Fraud Action.

***Third***, there are fact questions unique to the Fraud Action which are irrelevant to the Data Security Breach Actions. As an initial matter, 14 of the 16 Defendants[5] and 3 of the 5 Plaintiffs[6] in the Fraud Action are *not* parties to the Data Security Breach Actions. Each and every fact question related to these parties is therefore unique to the Fraud Action.

Even with respect to the few parties that do overlap, the Fraud Action arises out of Defendants' intentional fraud on the interoperability network and breaches of the agreements governing the frameworks. As to Defendants' fraud-related causes of action, Plaintiffs attack Defendants' abuses of the interoperability frameworks and submission of fraudulent queries for patient records. As a result, the manner in which patient records were taken by Defendants is critical. Plaintiffs must develop facts to establish that: (1) Defendants falsely represented to Plaintiffs that they were querying records via the frameworks for treatment purposes; (2) those representations and omissions were false because Defendants were requesting patient records to monetize them for commercial gain; (3) Plaintiffs relied on Defendants' misrepresentations and omissions; and (4) Plaintiffs suffered injury as a result. None of those issues are relevant in the majority of the Data Security Breach Actions because Plaintiffs are not parties and the Data Security Breach Actions are not fraud-related actions. Instead, as it relates to Epic and Trinity, the Data Security Breach Actions turn on whether they maintained adequate security architecture and measures to protect against unauthorized access to patient data, and whether their responses to the alleged security incident were timely and reasonable.

[5] Defendants RavillaMed, LlamaLab, Avinash Ravilla, Shere Saidon, Mammoth Dx, Mammoth Rx, Ryan Hilton, Daniel Baker, Max Toovey, Unit 387, Hoppr, Meredith Manak, SelfRx, and GuardDog are not parties to the Data Security Breach Actions.

[6] Plaintiffs OCHIN, Reid, and UMass Memorial Health are not parties to the Data Security Breach Actions. Reid was a Defendant in *Fox*, but the case was dismissed. *See Fox* Dkt. No. 48.

In addition, a critical component of the Fraud Action are Defendants' breaches of the agreements governing the Carequality and TEFCA interoperability frameworks. Fact questions related to the framework agreements, including what the terms require, the duties owed by Health Gorilla and other participants in the framework to other framework participants, and whether Defendants violated those obligations do not bear the same relevance to the Data Security Breach Actions. Instead, the Data Security Breach Actions are based on the common law and statutory duties allegedly owed by the defendants to individual patients to safeguard patient data by maintaining adequate security systems and responding promptly to alleged security breaches.

***Finally***, the common factual questions identified by Health Gorilla and the Panel confirm that the Fraud Action is materially different from the Data Security Breach Actions. The only fact questions identified that might overlap with the Fraud Action are (1) whether Health Gorilla's customers used the frameworks to acquire records for impermissible purposes; (2) whether and when Health Gorilla knew of its customers' impermissible purpose in querying records; and (3) to whom the records were transmitted and how they were misused. MDL Dkt. Nos. 1 at 7-8, 52 at 2. But these three questions are neither numerous nor complex, in particular in view of the heavier burden that applies here. *Scotch Whiskey*, 299 F. Supp. at 544.

Moreover, there is only surface overlap on these three fact questions. The "impermissible purpose" that is at-issue in the Data Security Breach Actions is the lack of patient consent to the disclosure of their records to unauthorized third parties. By contrast, the "impermissible purpose" that is at-issue in the Fraud Action is Defendants' false assertion of a treatment purpose—regardless of whether or not a patient "consented" to the disclosure of records. Indeed, under the HIPAA Privacy Rule, a covered entity may disclose protected health information to another health care provider for that provider's treatment activities *without* patient consent or authorization. 45

C.F.R. §§ 164.506(a), (c)(2); *see also id.* § 164.506(b)(1) (consent permitted, not required).

As to knowledge, the relevant knowledge in the Fraud Action is Health Gorilla's knowledge that some of its customers were not requesting records for treatment when enabling Defendants to fraudulently participate in and submit queries on the framework. By contrast, the relevant knowledge in the Data Security Breach Actions is the defendants' knowledge of an alleged breach of their respective security systems, thus triggering an alleged duty to notify patients.

And with respect to misuse of the records, the Fraud Action depends upon facts demonstrating to whom the records were disclosed after being queried (*i.e.*, to mass tort law firms, legal marketing or lead generation agencies, and/or insurance companies) and how they were misused (*i.e.*, taken for a non-treatment purpose). In the Fraud Action, Plaintiffs seek to establish the chain of access to the patient records beyond the initial fraudulent query—in other words where did those records end up. Conversely, the plaintiffs' allegations in the Data Security Breach Actions do not delve into these later-in-time links in the chain.

* * *

In sum, the common questions are uncomplicated and few, the unique questions are complex and many, and transfer is therefore not warranted.

### C. Transfer Will Not Serve the Convenience of the Parties and the Witnesses and Will Not Serve the Just and Efficient Conduct of the Litigations.

Transfer is also not appropriate where it "would not necessarily serve the convenience of the parties and witnesses or promote the just and efficient conduct of this litigation." *In re Accutane Prods. Liab. Litig.*, 560 F. Supp. 2d 1370, 1370 (J.P.M.L. 2008) (vacating conditional transfer order); *see also In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, 655 F. Supp. 2d 1379,

1381 (J.P.M.L. 2009) (same). Here, neither element is met: transfer will not serve the convenience of the parties and witnesses, nor will it promote the just and efficient conduct of the actions.

1. Transfer Will Not Serve the Convenience of the Parties and the Witnesses.

Transfer will not serve the convenience of the parties and witnesses in the Fraud Action. At the threshold, Plaintiffs filed suit in California—their chosen forum—bringing claims for fraud and breach of contract based on Defendants' misuses of the interoperability frameworks. As set forth above, the critical factual overlap is missing between the Data Security Breach Actions and the Fraud Action. To permit these later-filed, distinct putative class actions to disrupt the Fraud Action will not serve the convenience of the parties or witnesses. ***First***, 17 of the 21 parties in the Fraud Action are not parties to the Data Security Breach Actions. These parties' presence in the Data Security Breach MDL is irrelevant and unnecessary.

***Second***, nine of the parties in the Fraud Action either reside or operate in California while, at most, two parties reside in Florida. Plaintiffs' Compl. ¶¶ 26-30, 32-33, 35-48. Key witnesses reside in California too, and Plaintiffs have served a number of subpoenas on witnesses in the state. Transfer to the Southern District of Florida will deprive the California-tied parties and witnesses of their ability to litigate in a forum where they reside or operate.

***Third***, transfer risks delaying the Fraud Action, which has proceeded significantly with discovery and has an entered scheduling order through trial. This is in stark contrast to the Data Security Breach Actions, which are in the earliest stages of litigation. *See In re Prop. Assessed Clean Energy (Pace) Programs Litig.*, 764 F. Supp. 2d 1345, 1347 (J.P.M.L. 2011) (recognizing the risk of disruption and delay due to differences in procedural postures).

Because transfer would require the majority of the parties to the Fraud Action to participate in a multidistrict litigation where their presence is irrelevant, force numerous parties to litigate in

a state where they do not reside or operate, deprive Plaintiffs of their chosen forum, and likely cause delays, transfer does not serve the convenience of the parties or the witnesses.

2. Transfer Will Not Serve the Just and Efficient Conduct of the Litigations.

In determining whether just and efficient conduct of an action would be furthered by transfer, the Panel evaluates a variety of factors, including (1) whether the parties are agreeable to the transfer; (2) the commonality of the parties, claims, and remedies; (3) the cases' procedural postures; (4) the risk of duplicative discovery; and (5) the risk of inconsistent rulings. *See*, *e.g.*, *In re COVID-19 Bus. Interruption Prot. Ins. Litig.*, 482 F. Supp. 3d 1360, 1361-63 (J.P.M.L. 2020); *In re Real Est. Transfer Tax Litig.*, 895 F. Supp. 2d 1350, 1351 (J.P.M.L. 2012); *see also* Manual for Complex Litigation (Fourth) § 20.131. Here, these factors weigh against transfer.

**Plaintiffs Do Not Agree to Transfer.** Plaintiffs oppose the transfer, so this factor weighs against transfer. *In re Prospect Mortg., LLC, Fair Lab. Standards Act (FLSA) & Wage & Hour Litig.*, 987 F. Supp. 2d 1383, 1383 (J.P.M.L. 2013) (denying consolidation where all plaintiffs opposed centralization and individualized factual disputes would predominate).

**The Parties, Claims, and Remedies are Distinct.** Conditional transfer orders are vacated when the action to be transferred and the cases in an MDL involve "different defendants, different claims and theories of liability, different putative classes, and seek different relief." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, MDL No. 2785, 2017 WL 11913624, at *2 (J.P.M.L. Dec. 5, 2017); *see also In re Florida, Puerto Rico, and U.S. Virgin Islands Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367, 1368 (J.P.M.L. 2018) (denying centralization where "[e]ach case necessarily involve[d] a different property, different insureds, different witnesses, different proofs of loss, and different damages."). This factor weighs against transfer here. ***First***, as stated above, 17 of the 21 parties in the Fraud Action are not parties

to the Data Security Breach Actions. Transfer would require these parties to unnecessarily participate in a litigation where their presence is irrelevant.

***Second***, the legal claims and theories pursued are distinct. Plaintiffs bring claims for fraud, aiding and abetting fraud, breach of the contracts governing the interoperability frameworks, violation of California Business & Professions Code § 17200, *et seq.*, and violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* The Data Security Breach Actions involve causes of action for negligence, breach of implied contract, breach of the implied covenant of good faith and fair dealing, breach of bailment, unjust enrichment, invasion of privacy, and intrusion upon seclusion. The Data Security Breach Actions also involve allegations based on cybersecurity safeguards, HIPAA Security Rules Standards, FTC Guidelines and industry standards, and data breach notifications—none of which are at-issue in the Fraud Action.

***Third***, the remedies pursued diverge. Plaintiffs seek an injunction barring Defendants from participating in the interoperability frameworks and using any fraudulently obtained patient records. In the Data Security Breach Actions, the putative classes seek monetary damages and injunctions requiring certain security measures and disclosures related to the alleged breaches.

**The Fraud Action is Significantly More Advanced Procedurally.** As explained above, the Fraud Action is far more advanced procedurally than the nascent Data Security Breach Actions. Transfer would therefore likely "disrupt, or at least delay, the progress of" the Fraud Action, which weighs against transfer. *In re Prop. Assessed Clean Energy (Pace) Programs Litig.*, 764 F. Supp. 2d 1345, 1347 (J.P.M.L. 2011) (denying transfer where the "[California actions] [were] already proceeding apace with key issues presented in defendants' motion to dismiss already briefed in a coordinated manner" while "remaining actions [were] at their earliest stages"); *see also Hurricane*

*Seasons*, 325 F. Supp. 3d at 1369 (holding that the "widely varying procedural posture of the cases further weighs against centralization").

**The Scope and Breadth of Discovery Differs.** When the scope and breadth of discovery differ substantially, as here, transfer is denied. *See In re IBM Antitrust Litig.*, 328 F. Supp. 509, 510-11 (J.P.M.L. 1971) (denying transfer where scope and breadth of discovery was likely to differ substantially); *COVID-19 Bus. Interruption*, 482 F. Supp. 3d at 1363 (denying transfer where "[a]ny efficiencies with respect to common discovery and motion practice would be outweighed by the unique discovery"). In the Data Security Breach Actions, discovery will focus on patient-level harm, including, among other things, whether specific class members' data was accessed, when it was accessed and by whom, and whether each class member experienced a cognizable harm and what that harm was; expert testimony regarding the applicable standard of care for the protection of personal health information in the context of data security risks; and issues related to defendants' data-security practices.

Discovery in the Fraud Action has a different focus, borne out of the underlying factual differences detailed above. *See In re Starbucks Corp. Mktg. & Sales Pracs. Litig.*, 222 F. Supp. 3d 1348, 1349 (J.P.M.L. 2016) (where cases "involve different factual theories of liability . . . [the] factual dissimilarities likely will result in discovery . . . issues that are not shared"). To start, all discovery as to the 17 parties in the Fraud Action that are not parties to the Data Security Breach Actions is inherently unique to the Fraud Action. *In re N.Y. Tax Foreclosure Surplus Litig.*, 743 F. Supp. 3d 1378, 1379 (J.P.M.L. 2024) (where actions involved numerous distinct parties, "there would be few, if any, efficiencies to be gained by centralizing the actions for common discovery."). In addition, discovery in the Fraud Action will focus on the contractual agreements entered into by the Defendants, the Defendants' obligations pursuant to those agreements vis-à-vis other

participants on the frameworks, whether Defendants complied with their contractual obligations, the intentional misrepresentations and omissions made by Defendants to Plaintiffs about the purpose for which they were accessing patient records, Plaintiffs' reliance on those misrepresentations and omissions, Defendants' use and dissemination of patient records obtained for non-treatment purposes, and the harm caused to Plaintiffs by Defendants' abuses of the frameworks—none of which is relevant to the Data Security Breach Actions.

In the minimal areas where discovery may overlap, the parties can coordinate to ameliorate any issues. For example, "notices of deposition can be filed in all related actions; the parties can stipulate that any discovery relevant to more than one action can be used in all those actions; or the involved courts may direct the parties to coordinate their pretrial activities." *In re: Adderall XR (Amphetamine/Dextroamphetamine) Mktg., Sales Pracs. & Antitrust Litig.*, 968 F. Supp. 2d 1343, 1345 (J.P.M.L. 2013) (denying centralization in favor of the parties informally coordinating discovery to avoid duplication); *see also In re AriZona Beverage Co. Prods. Mktg. & Sales Practices Litig.*, 609 F. Supp. 2d 1369, 1369 (J.P.M.L. 2009) (same).

**The Risk of Inconsistent Rulings is Miniscule.** ***First***, these actions will proceed in only two district courts—the Central District of California and Southern District of Florida—so there is little risk of inconsistent rulings. *See In re CP4 Fuel Pump Mktg., Sales Practices, & Prods. Liab. Litig.*, 412 F. Supp. 3d 1365, 1366 (J.P.M.L. 2019) (risk of inconsistent rulings was lessened when there were only "ten constituent actions and two tag-alongs").

***Second***, the "different factual theories of liability" and different parties involved, detailed above, "will result in . . . pretrial motion . . . issues that are not shared." *Starbucks*, 222 F. Supp. 3d at 1349. The Panel posited in its Transfer Order that centralization of the Data Security Breach Actions will "prevent inconsistent rulings on pretrial motions, particularly with respect to standing

and class certification. MDL Dkt. No. 15 at 2. But Plaintiffs respectfully submit that there are no shared standing or class certification issues. Plaintiffs—participants in the interoperability frameworks—are differently positioned than the individual patient plaintiffs in the Data Security Breach Actions. And the Fraud Action is not a class action.

Moreover, "consultation and cooperation among the [two] concerned district courts, if deemed appropriate by those courts, coupled with the cooperation of the parties, would be sufficient to minimize the possibility of conflicting pretrial rulings." *Eli Lilly*, 466 F. Supp. at 244 (denying transfer, finding informal consultation and cooperation sufficient); *see also In re Axon Enter., Inc., Body-Worn Camera & Digital Evidence Mgmt. Sys. Antitrust Litig.*, 776 F. Supp. 3d 1344, 1345 (J.P.M.L. 2025) ("voluntary cooperation and coordination among the parties and the involved courts to avoid duplicative discovery or inconsistent pretrial rulings" should be pursued in lieu of consolidation); *In re New York Dep't of Corr. & Cmty. Supervision Medications With Abuse Potential Prisoner Litig.*, 709 F. Supp. 3d 1390, 1392 (J.P.M.L. 2023) ("[t]o the extent there is any possibility of duplicative discovery or inconsistent pretrial rulings, voluntary cooperation and coordination among the parties and the involved courts is a preferable alternative to centralization"). As such, this factor too weighs against centralization of the Fraud Action.

## **CONCLUSION**

Transfer would inject Plaintiffs' distinct fraud lawsuit into the data security breach MDL, burdening the transferee court with claims, parties, and discovery that have no bearing on the Data Security Breach Actions. The just and efficient resolution of the litigations will not be served by doing so. Plaintiffs respectfully request that the Conditional Transfer Order (CTO-1) be vacated.

/ / /

/ / /

Dated: September 1, 2026

Respectfully submitted,

*/s/ Marshall L. Baker*
Marshall L. Baker (Cal. Bar No. 300987)
mbaker@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone: 310.229.1000
Facsimile: 310.229.1001

- and -

Anthony T. Pierce (D.C. Bar No. 415263)
apierce@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006-1037
Telephone: 202.887.4000
Facsimile: 202.887.4288

*Counsel for Plaintiffs*
*Epic Systems Corporation, OCHIN, Inc., Reid Hospital & Health Care Services, Inc. d/b/a Reid Health, Trinity Health Corporation, and UMass Memorial Health Care, Inc.*