Before the United States Judicial Panel on Multidistrict Litigation

| | |
|---|---|
| In re: Health Gorilla, Inc., et al., Data Security Breach Litigation | MDL No. 3193 |

This Document Relates To:

***Epic Systems Corporation, et al., v. Health Gorilla, Inc., et al.***
Case No. 2:26-cv-00321-FMO-RAO (C.D. California)

**DEFENDANT HEALTH GORILLA'S RESPONSE TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-1) [ECF 6]**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 4

A. The Epic Complaint Alleges Health Gorilla Caused Unauthorized Disclosure Of Patient Records To Connections On The Exchange Networks........ 4

B. The Patient Actions Allege That Epic And Health Gorilla Caused Unauthorized Disclosure Of Patient Records To Connections On The Exchange Networks. ........ 6

C. Epic Action Discovery Is At An Early Stage While Multiple Motions To Dismiss Remain Pending. ........ 7

ARGUMENT ........ 8

A. The Epic Action And The Patient Cases Share Evidence And Dispositive Questions. ..... 8

1. Epic's knowledge and conduct are common questions across the cases. ........ 9

2. Health Gorilla's knowledge of and duty to vet its Connections' purposes are common across the cases. ........ 10

3. Attribution and access-log discovery overlaps. ........ 11

4. Treatment purpose, downstream use, and deletion relief overlap. ........ 12

B. Every Case Turns On Framework Rules. ........ 13

C. Centralization Brings Efficiencies Even When Some Issues Are Distinct. ........ 14

1. Nonidentical parties and claims do not eliminate the common evidence. ........ 15

2. The relevant convenience is collective and pretrial. ........ 16

3. Existing progress and the GuardDog judgment can be preserved without exempting all remaining discovery. ........ 17

D. Judge Olguin's Rule 42 Ruling Did Not Decide The Panel's Distinct Section 1407 Question, And Rests On An Incomplete Factual Record. ........ 18

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Christianson v. Colt Indus. Op. Corp.*,
486 U.S. 800 (1988) .......... 18, 20

*Country Fresh Batter, Inc. v. Lion Raisins, Inc.*,
No. 117CV01527DADBAM, 2018 WL 1071330 (E.D. Cal. Feb. 26, 2018) .......... 9

*In re Digital Advert. Antitrust Litig.*,
555 F. Supp. 3d 1372 (J.P.M.L. 2021) .......... 14, 17

*Gelboim v. Bank of Am. Corp.*,
574 U.S. 405 (2015) .......... 15

*Home Depot USA, Inc. v. Lafarge N. Am., Inc.*,
59 F.4th 55 (3d Cir. 2023) .......... 15

*Johnson v. Manhattan R.R. Co.*,
289 U.S. 479 (1933) .......... 16

*In re Katz Interactive Call Processing Pat. Litig.*,
481 F. Supp. 2d 1353 (J.P.M.L. 2007) .......... 15, 17

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) .......... 16

*In re MOVEit Customer Data Security Breach Litig.*,
699 F. Supp. 3d 1402 (J.P.M.L. 2023) .......... 15

*In re Nat. Student Mktg. Litig.*,
368 F. Supp. 1311 (J.P.M.L. 1972) .......... 18

*In re Nat'l Prescription Opiate Litig.*,
290 F. Supp. 3d 1375 (J.P.M.L. 2017) .......... 15

*Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
175 F. Supp. 2d 489 (S.D.N.Y. 2000) .......... 9

*In re Pharmacy Benefit Managers Antitrust Litigation*,
582 F.3d 432 (3d Cir. 2009) .......... 19

*In re Pork Antitrust Litigation*,
2021 WL 5310590 (D. Minn. Nov. 12, 2021) .......... 19

*Pyramid Lake Paiute Tribe of Indians v. Hodel*,
882 F.2d 364 (9th Cir. 1989) ....................20

*In re Regents of Univ. of California*,
964 F.2d 1128 (Fed. Cir. 1992)....................19

*Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*,
131 F.4th 661 (9th Cir. 2025) ....................17

**Statutes**

28 U.S.C. § 1407 .................... *passim*

California Business and Professions Code §17200 ....................1, 5

Computer Fraud and Abuse Act ....................1

**Other Authorities**

45 C.F.R. § 164.506 ....................12

Fed. R. Civ. P. 9(b) ....................7

Fed. R. Civ. P. 30 ....................16

Fed. R. Civ. P. 42 ....................18, 19, 20

Defendant Health Gorilla opposes and responds to Epic Systems Corporation, Ochin, Inc., Reid Hospital & Health Care Services, Inc., Trinity Health Corporation, and UMass Memorial Health Care, Inc. ("Movants")'s Motion to Vacate the Conditional Transfer Order and Memorandum of Law In Support, ECF 6 & 6-1 ("Mem.")

## PRELIMINARY STATEMENT

This case belongs in the MDL. Movants object to the Panel's order to transfer the Epic Action[1] because they contend the Epic Action is "distinct" and "fundamentally different" factually and legally from the already-centralized patient class actions. Mem. 8, 20-25. But, to accept Movants' position, this Panel would have to ignore that ***the patient cases expressly rely upon*** the same allegations of breach of duties as in the Epic Action. The patient cases not only incorporate the Epic Complaint by reference, but also they offer the same account as Movants do of Health Gorilla's role in both the interoperability system and the alleged unauthorized disclosures, and they allege the same scheme, wherein record requests were made under a false pretense of "treatment."

Contrary to Movants' view, the cases do not lack a common center simply because Movants are not patients whose records and consent are at issue. Both sets of claims hinge on identical core questions: whether the network exchange mechanisms operated lawfully, what information Epic and Health Gorilla possessed regarding the queries, and when they knew it. Yes, Movants bring causes of action for conduct they call "fraud," "aiding and abetting," breach of the

---

[1] Plaintiffs refer to the related case at issue, *Epic Systems Corp. et al. v. Health Gorilla, Inc., et al.*, No. 2:26-cv-00321 (C.D. Cal.), as the "Fraud Action." Because this naming is misleading in that it omits that Plaintiffs have alleged a violation of California Business and Professions Code Section 17200 et seq., with underlying predicates of breaches of statutory and regulatory breaches HIPAA and the Computer Fraud and Abuse Act, as well as two counts for breach of contract premised on alleged breaches of data security requirements, Health Gorilla refers herein to the aforementioned litigation as the "Epic Action."

Carequality and TEFCA rules and contracts, and unfair business practices (predicated in part on ***violation of HIPAA's Privacy and Security Rules***), whereas the patient actions call the same conduct a "Data Breach" and failure to safeguard records (also in violation of HIPAA's Privacy and Security Rules), as well as a failure to notify patients timely of potential security risks.[2] And it is true that the cases do not all overlap on every single legal issue or path to redress. But Movants cannot with a straight face argue that the different cases put at issue different alleged wrongs—all turn on the questions the Panel already identified as common: "whether and when Health Gorilla had knowledge that its customers intended to use the frameworks to acquire records for impermissible purposes, whether its customers did so and, if so, to whom the records were transmitted and how they were misused." CTO-1 2.

Critically, the factual landscape has shifted since this litigation began. It is now clear that Epic identified the very network queries it challenges as early as October 2023, yet allowed them to continue for over 14 months without escalation. It is just as clear that Health Gorilla neither knew these facts nor sanctioned any improper access to the interoperability frameworks—all while Epic and its co-plaintiffs in the Epic Action did. This shared timeline now forms the evidentiary center of gravity for both fora. In the Epic Action, Health Gorilla's anticipated defenses of unclean hands and estoppel will establish Epic's and its co-plaintiffs' delay in acting on network queries it believed improper. In the patient actions, class plaintiffs assert that very same delay as evidence of negligence. Keeping these actions separate guarantees redundant discovery into Epic's internal communications, audit logs, and network monitoring from October 2023 onward.

[2]The *Patterson*, *Fox*, and other patient complaints likewise plead these framework-based facts under the labels of a "Data Breach" and negligence, negligence per se (based on alleged HIPAA violations), breach of implied contract, invasion of privacy, and unjust enrichment.

In contrast, transferring the Epic Action to the MDL is all the more sensible because of the potential that mandatory alternative dispute processes will inform the record. Health Gorilla and other Epic Action defendants have moved to dismiss or stay the Epic Action on the ground that Movants leapfrogged the mandatory dispute-resolution procedures that the Carequality and TEFCA agreements require before any participant may litigate. If the motions are granted, the Epic Action parties return to Carequality and the TEFCA Recognized Coordinating Entity ("RCE"), which are contractually charged with construing and applying their own rules. By accusing Health Gorilla and Epic of not exercising due care in their roles on these networks, every patient action turns on whether those same rules were violated. A single court should oversee the cases that hinge on that determination with the benefit of the results from the dispute process. The alternative would be that Carequality or the RCE could conclude that Health Gorilla and its co-defendants did nothing wrong, even as Health Gorilla is forced to defend actions across the country premised on the opposite conclusion. And the existence of this motion to dismiss, coupled with the ***reality*** of how far the Epic Action parties have left to go with discovery, undermines Movants' representation to this Panel that the Epic Action is too "advanced procedurally," Mem. 22, to be transferred. Movants are not "well on their way to proving their claims," Mem. 8, when neither Health Gorilla nor any Movant—including Epic itself—has produced a single document.[3]

Moreover, Movants' attempt to amplify postural and procedural distinctions across the cases—such as nonidentical parties or the need for individualized damages—falls flat. Centralization under Section 1407 does not require perfect commonality or predominance of

[3] Among other things, Health Gorilla seeks documents about how Epic promised to pay legal fees for any provider that joined its lawsuit, effectively acting as a litigation funder for federal litigation that materially breaches each of the Carequality and TEFCA agreements requiring mandatory dispute resolution.

common issues, as the Panel knows. Significant factual overlap justifies the efficiencies of centralization under Section 1407 and outweighs any differences across the cases.

Movants' remaining threshold argument—that a California District Judge already decided this question by declining to relate two cases on his own docket—fails because no doctrine prohibits the Panel from undertaking the distinct question of whether the considerations of efficiency and economy weigh in favor of centralization under Section 1407. The Panel should deny the motion and allow the Epic Action to proceed within the MDL.

## BACKGROUND

Throughout their memorandum, Movants present contested allegations as though already proven. They tell the Panel that discovery has "confirmed" their theory, that they have amassed "corroborating" evidence, and that they are "well on their way to proving their claims." Mem. 6-8, 10. The Epic Action is at the pleading stage, with Health Gorilla's motion to dismiss fully briefed and undecided, and Movants' own cited evidence negates their account of Health Gorilla's own conduct. The Panel need not accept Movants' characterizations, even if they were relevant to the transfer determination.

### A. The Epic Complaint Alleges Health Gorilla Caused Unauthorized Disclosure Of Patient Records To Connections On The Exchange Networks.

On January 13, 2026, Movants filed the Epic Action. They allege that RavillaMed PLLC, LlamaLab, Inc., Mammoth Rx, Inc., Unique Medi Tech, LLC, d/b/a Mammoth Dx, and Mammoth Path Solution, LLC (together with Mammoth Dx, "Mammoth"), Unit 387 LLC ("Unit 387"), SelfRx, LLC, d/b/a MySelf.Health, Hoppr, LLC, Critical Care Nurse Consultants, LLC, d/b/a GuardDog Telehealth ("GuardDog"), and various individuals affiliated with these entities (together, the "CC Defendants") are "[u]nscrupulous businesses and individuals [who] are exploiting interoperability frameworks to obtain patient records on a large scale under the false

pretense of providing treatment." ECF 6-6, Marshall Decl. Ex. 3 ("Epic Compl.") ¶ 124. These CC Defendants have, according to Movants, "improperly gain[ed] access to records of Epic's healthcare provider customers," *id.* ¶ 125, and "unlawfully obtain and misappropriate confidential patient records," *id.* ¶ 142. According to Movants, the CC Defendants gained access to patient records by, among other things, "camouflag[ing] themselves" to create an "outward appearance" of being medical treatment providers, *id.* ¶ 127, "manipulating their exchange metrics to appear like an entity providing treatment," *id.* ¶ 129, and misrepresenting their purposes in requesting patient records, *e.g.*, *id.* ¶¶ 174-182, 227.

Movants further allege that Health Gorilla, an Implementer of the Carequality framework and a Qualified Health Information Network ("QHIN") under TEFCA that onboarded Connections and Participants onto the networks, "should have discovered" "red flags" about these Connections, had it "performed the diligence required of it under the law and rules governing the national interoperability frameworks." *Id.* ¶ 186. The Epic Complaint alleges that Health Gorilla failed in access-control and oversight, including through inadequate vetting of CC Defendants, failure to remove them promptly after warnings, and audit-log patterns suggesting non-treatment activity that should have been detected earlier—all "***to the detriment of patient privacy***." *Id.* ¶¶ 187, 227-28 (emphasis added).

The Epic Complaint asserts ten causes of action, with Health Gorilla named in eight: three counts of fraud, premised on the theory that Health Gorilla and its onboarded Connections deceived the disclosing providers about the purpose of their record requests (*id.* ¶¶ 198-251); three counts of aiding and abetting fraud, premised on the theory that Health Gorilla knowingly assisted those same requests (*id.* ¶¶ 252-278); a claim under California Business and Professions Code Section 17200, premised on the same alleged conduct and alleged underlying violations of state

and federal patient privacy and health data laws and regulations (*id.* ¶¶ 279-286); and one count of breach of contract arising from Health Gorilla's alleged breach of the data-security and permitted-purpose provisions of the Carequality and TEFCA agreements (*id.* ¶¶ 287-301). All claims turn on whether the records requests were fraudulent, whether Health Gorilla knew or should have known, to whom the records were transmitted, and how they were used.

### B. The Patient Actions Allege That Epic And Health Gorilla Caused Unauthorized Disclosure Of Patient Records To Connections On The Exchange Networks.

Following the Epic Complaint, patients began to sue Health Gorilla and other Epic Action parties, including Epic, for alleged injuries relating to the patient record exchanges alleged in the Epic Action. The first of these putative class actions was filed on February 23, 2026, in *Patterson v. UVA Health*, No. 2:26-cv-01938 (C.D. Cal.) (the "Patterson Action").

The patient actions lean heavily on, and in several instances expressly adopt, the Epic Complaint. For example, Patterson "incorporates by reference the facts alleged in [the Epic Action], including ¶¶ 1-25, which detail the history of the relationship amongst the Defendants." EC 6-32, Baker Decl. Ex. 29 ("Patterson Compl.") ¶ 5 n.3. Patterson alleges disclosures to Mammoth after purported treatment representations and asserts duties not to share information with unauthorized entities and to act on warnings. *Id.* ¶¶ 5-7, 52-55.

The complaints in *Banh*, *Beaudreau*, and *Fox* all contain the same formulation acknowledging ***by paragraph 2*** that Epic's representations in the Epic Action are ***the genesis of*** the patients' complaint: "Defendant Epic has publicly acknowledged that Health Gorilla, Inc. … allowed its clients to access patient records stored by healthcare providers on Epic's systems … under the false pretense of 'treatment' purposes."[4] They cite the Epic Complaints and Patterson

[4] ECF 6-12, Baker Decl. Ex. 9, Compl., *Banh v. Epic Sys. Corp., et al.*, Case No. 3:26-cv-00216-AMB (W.D. Wis.), ("Banh Complaint"); ECF 6-34, Baker Decl. Ex. 31, Compl., *Beaudreau v.*

Complaints. *Id.* In short, the allegations in the patient actions center on the events Movants put at issue in the Epic Action.

Several of the patient cases also assign fault to Epic. Patterson, for example, alleges that "Defendant Epic was apparently well aware of Defendants Gorilla Health's [*sic*] and/or Mammoth's alleged misuse of Private Information, but took no serious steps to correct and/or stop the breach until January 2026, well after the improper access occurred." Patterson Compl. ¶ 6. Whether Epic knew of the alleged misuse, and when, is thus squarely at issue in the patient actions, just as it is in the Epic Action, where Epic's prayer for relief seeks, *inter alia*, injunctions that depend on its lack of unclean hands.

### C. Epic Action Discovery Is At An Early Stage While Multiple Motions To Dismiss Remain Pending.

Health Gorilla moved to dismiss the Epic Action on February 26, 2026. Among other grounds, Health Gorilla notes the Epic Action never belonged in court at all because the Carequality Connected Agreement ("CCA") and the TEFCA Common Agreement each require participants to exhaust mandatory internal dispute-resolution procedures before litigating, and Movants filed suit without so exhausting. *See* Wolfson Decl. Ex A (Health Gorilla's MTD) & Ex. B (Mem. ISO Motion to Dismiss) 14-18. The only exception is if a party seeks "immediate injunctive relief" in court, which Epic and the other Epic Action plaintiffs never have—to date, they have never moved for a temporary restraining order or preliminary injunction. Health Gorilla also contends that Movants lack enforceable contractual rights against it and have failed to plead fraud or aiding and abetting with the particularity Rule 9(b) requires. Ex. B 14-18. The motion is fully briefed and pending. *See* ECF 6-10, Baker Decl. Ex. 7, Docket Sheet in Epic Action.

---

*Epic Sys. Corp., et al.*, Case No. 3:26-cv-00215-AMB ("Beaudreau Compl."); ECF 6-18, Baker Decl. Ex. 15, *Fox, et al. v. Epic Sys. Corp., et al.*, Case No. 2:26-cv-04678-FMO (C.D. Cal.) ("Fox Complaint").

Discovery in the Epic Action also remains in its earliest stage. The "copious material evidence" and "thousands" of documents that Movants purport to have obtained, Mem. 10 & n.2, refer only to 3,365 documents produced by two parties as of Movants' submission. No Movant has produced discovery, nor has Health Gorilla. The parties have not begun to negotiate custodians or search terms for the production of documents. The operative schedule sets the close of fact discovery for May 2027, expert discovery for July 2027, and trial for January 2028. *See* ECF 6-10. The great bulk of the common work therefore lies ahead.

Furthermore, far from being fully developed, early investigative efforts have only recently exposed the extent of Epic's own knowledge. The record indicates that Health Gorilla did ***not*** act in the way the Epic Action plaintiffs allege and further indicates at least Epic—and, potentially, several of its co-plaintiffs—possessed knowledge of the disputed network traffic for over a year before filing suit, a revelation that perfectly bridges the evidentiary gap between Epic's claims of "fraud" and the patient plaintiffs' claims of failure to safeguard data.

## ARGUMENT

### A. The Epic Action And The Patient Cases Share Evidence And Dispositive Questions.

The patient plaintiffs allege that their health records were disclosed without consent or authorization to parties who requested the records through allegedly fraudulent queries. *See, e.g.*, Patterson Compl. ¶¶ 5, 53; Banh Compl. ¶¶ 36, 39. In the Epic Action, Movants also allege that fraudulent queries resulted in unlawful patient record disclosure, and that Health Gorilla is also responsible for the conditions that resulted in those disclosures. Epic Compl. ¶ 196. Movants try to dismiss these overlapping questions as mere "surface overlap." Mem. 18. But these matters will drive fact discovery in both sets of cases, which will draw upon many of the same custodians and repositories, including framework logs, query records, and audit trails, as well as the evidence

of what each CC Defendant represented to Health Gorilla and to Carequality, and how Health Gorilla responded to those representations.

1. Epic's knowledge and conduct are common questions across the cases.

Movants argue that the different cases put at issue different issues of scienter and knowledge, in that their case turns on Health Gorilla's knowledge of fraudulent conduct, whereas only the patient cases turn on whether and when discovery of data vulnerability should have triggered Epic's notification duties. Mem. 19. Movants even go so far as to say that the conduct of Epic is "not at issue" in the Epic Action. Mem. 16. That is wishful thinking. What information Epic and the providers possessed and how they responded is relevant not only to Movants' affirmative claims in multiple ways (including the injunctive relief identified in their prayer for relief), but also will be highly relevant to Health Gorilla's defenses and any counterclaims.

In fact, determining what information Epic possessed regarding network queries, and when it received that information, is a threshold factual issue requiring shared discovery across both litigations. The Epic Complaint alleges that Movants actually and justifiably relied on representations at issue when the providers disclosed records. Epic Compl. ¶¶ 230-32; Mem. 17. Health Gorilla is entitled to respond to that element of the fraud claims by, among other things, determining what the Movants knew when—*i.e.*, explore whether any supposed reliance was reasonable. "By its very nature, an allegation of fraud is grounded fundamentally on the claimant's state of mind, on what the given plaintiff actually knew at a stated time and how material that information was to him." *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 175 F. Supp. 2d 489, 493 (S.D.N.Y. 2000). Actual knowledge defeats a fraud claim, and "in determining whether reliance on a misrepresentation is justifiable, the issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience." *Country Fresh Batter, Inc. v. Lion Raisins, Inc.*, No. 117CV01527DADBAM,

2018 WL 1071330, at *2 (E.D. Cal. Feb. 26, 2018) (quotations and citation omitted).

Epic's knowledge of security risks will only become more central to the Epic Action as it develops. Health Gorilla has not yet answered, pleaded affirmative defenses, or had occasion to counterclaim. Among the defenses Health Gorilla plans to raise are estoppel and unclean hands, which bar the equitable relief Epic seeks and squarely put Epic's own conduct at issue, including what Epic knew about the alleged misuse, and when it knew it. That inquiry directly overlaps the patient actions, which allege that Epic "was apparently well aware" of the alleged misuse yet "took no serious steps to correct and/or stop the breach until January 2026." Patterson Compl. ¶ 6. The same evidence of Epic's knowledge and response will therefore be developed in both sets of cases.

2. Health Gorilla's knowledge of and duty to vet its Connections' purposes are common across the cases.

Movants say the "exchange mechanisms operated as designed" and their suit concerns deception rather than security architecture, and thus it is not a data "breach" case. Mem. 8. This representation is inconsistent with their allegations that Health Gorilla was responsible for onboarding, vetting, validating exchange purposes, and monitoring compliance, *id.* 9, breached its obligations to ensure Connections only "engage in exchange activities" on the networks "for permitted purposes" including as defined by HIPAA, and not to "make fraudulent requests for patient data," Epic Compl. ¶¶ 257, 267, 275, 294-295, 298, and breached the "principles of trust essential for the exchange of highly sensitive information," *id.* ¶¶ 297, 313, "to the detriment of patient privacy," *id.* ¶ 187.

The patient complaints allege the same failures. Patterson alleges disclosures to Mammoth after purported treatment representations, incorporates Epic's factual account, and asserts duties not to share records with unauthorized entities and to act on warnings. Patterson Compl. ¶¶ 5-7 & nn.3-4, 52-55. Customer applications, provider-verification materials, treatment representations,

onboarding approvals, and access-termination decisions bear on the patients' and Movants' cases.

Movants' memorandum presses these knowledge and vetting questions hard, asserting that Health Gorilla "intentionally onboarded" its customers and "knowingly allowed them to retrieve medical records under the false pretense" of treatment, that it "was aware of and ignored red flags," and that discovery has "confirmed" as much. Mem. 9-14. But even the limited discovery produced—the very documents Movants rely on—when read in full and in context, tend to show that Health Gorilla merely relayed the framework operator's conditions and then diligently acted on concerns. That the parties contest what these records show is not a reason to keep the Epic Action apart; it is a reason to develop the shared record once, before one Judge.

Movants hide behind the confidentiality order as a reason not to submit to the Panel the evidence that they describe for the Panel, but with the benefit of the documents, it would take just a few examples to illustrate the gap between Movants' narrative and the underlying documents. Movants miss entirely that the very day that Epic raised certain concerns about data spikes, Health Gorilla began an investigation and then, within hours, suspended the Connection. Movants claim that "Health Gorilla simply told GuardDog to strip all references to its legal work from its public-facing website," *id.*, but omit that Health Gorilla had already confirmed in writing that the account at issue was prohibited from querying any records other than for "treatment purposes" and not for any legal services.

3. <u>Attribution and access-log discovery overlaps.</u>

Movants misleadingly characterize the three common questions identified by the Panel as "limited" and "not complex," Mem. 15, but even Movants' own briefing underscores that answers to these broader questions will require complex work. Movants emphasize that SelfRx's founder attested that SelfRx "requested records through the Carequality framework for only 21 patients, receiving less than 100 records total." Mem. 11 (citing ECF 6-9, Baker Decl. Ex. 6, ¶¶ 7-8). Yet,

Movants assert, SelfRx's Carequality directory entry "was used to take ***many more*** medical records from Epic's customers," a fact SelfRx disclaims. Mem. 11 (emphasis added). Movants thus state that they believe discovery will show Unit 387 actually made those requests, *id.*, a contention that will be tested by determining who used an entry, during what period, to request which records, and under whose authority. Moreover, the Epic Complaint describes large spikes in unique patient-record access as evidence of Health Gorilla's alleged breaches of duties to monitor its Connections. Epic Compl. ¶ 228. Collection, authentication, and explanation of overlapping logs is complex work that should be done once, under the same procedural protections for PII and sensitive material.

Centralization would spare the parties from having to repeat discovery work or devote resources to determining how to share highly sensitive data across fora and under different discovery procedures.

4. Treatment purpose, downstream use, and deletion relief overlap.

Both sets of cases will resolve whether the requests actually concerned "treatment," which remains in controversy, regardless of Movants' attempt to treat treatment-purpose representations as fundamentally foreign to issues of patient consent and applicable HIPAA provisions permitting certain treatment disclosures without separate authorization. Mem. 18-19 (citing 45 C.F.R. § 164.506(a), (b)(1), (c)(2)). The frameworks' rules incorporate HIPAA. The Carequality Query-Based Document Exchange Implementation Guide and the TEFCA XP SOP each define the permitted purpose of "Treatment" "in the same manner as HIPAA," Epic Compl. ¶¶ 67, 97, and permit exchange only for permitted purposes "as defined" by those authorities, *id.* ¶¶ 63-64, 75, 94-95, 295, 310, 311. The patient plaintiffs rely on the same treatment definition and privacy and security standards. *See*, *e.g.*, Banh Compl. ¶¶ 36-37 (alleging Health Gorilla's clients queried records under a "treatment" purpose that was "not made for legitimate treatment purposes");

Patterson Compl. ¶¶ 5-7. Movants themselves ground their unfair-competition and breach claims in alleged violations of HIPAA's Privacy and Security Rules. *See, e.g.*, Epic Compl. ¶¶ 294-295. Whether a given "Treatment" request was in truth a treatment request—a question that decides the Epic Action—goes hand in hand with the HIPAA question that decides whether the patients' records were disclosed without authorization.

As an example, Patterson alleges that Mammoth's asserted treatment access actually served attorney recruitment and contends that information was shared with entities lacking proper authorization. Patterson Compl. ¶¶ 5, 53. Evidence of Mammoth's actual purpose therefore bears on the patient and Epic Actions, even though the Epic Action does not include a private HIPAA claim. Likewise, downstream receipt and use are not inherently irrelevant to the patient litigation, as Movants suggest. Tracing a recipient or successor can help establish where the patient's information went as well as whether the alleged commercial scheme occurred.

The prayers for relief also overlap, contrary to Movants' depiction. Movants seek injunctive relief for deletion and cessation of dissemination, while patients request deletion unless retention can be justified. *Compare, e.g.*, Epic Compl., Prayer ¶ 1(d) (seeking an order "requiring" defendants to "delete and to discontinue any further use" of patient health information) *with* Patterson Compl., Prayer ¶ 5(c) (seeking an order "requiring" defendants to "delete and purge" patient health information). Common supervision can distinguish evidentiary retention from continued operational use and ensure that remediation does not destroy another party's needed proof, as a prospective problem is how to preserve evidence needed across cases while restricting further use and addressing the proposed deletion.

**B. Every Case Turns On Framework Rules.**

Health Gorilla has sought to enforce the dispute resolution provisions in its Carequality and TEFCA agreements, and the prospect of any forthcoming proceedings before Carequality

and/or the TEFCA RCE sharpens the need for coordination. Movants were required to bring their grievance concerning any alleged breaches of Health Gorilla to Carequality and the RCE before suing. Ex. B 15-19. Although Epic helped write those agreements and those processes, *see id.* 9, and although Health Gorilla was actively cooperating with Epic to investigate and respond to Epic's concerns over Connections, Epic leapfrogged those processes and filed in court instead, with no warning to Health Gorilla. (As noted, its basis for doing so was an exception for situations where a party seeks "immediate injunctive relief," but Epic and its co-plaintiffs have not once sought a temporary restraining order or preliminary injunction. *See* Ex. B 16, 20.) If Health Gorilla's motion is granted, the dispute over whether Health Gorilla and its co-defendants violated the frameworks' rules returns to Carequality and the RCE—the bodies the agreements charge with interpreting and applying those rules in the first instance.

The patient cases are built on the premise that Health Gorilla's customers violated the frameworks' permitted-purpose rules and that Health Gorilla failed to prevent it. *See*, *e.g.*, Patterson Compl. ¶¶ 5-7; Banh Compl. ¶¶ 36-37. If Carequality or the RCE conclude that the frameworks' rules were not violated—or that Health Gorilla met its obligations—that resolution bears directly on the liability theory shared across the MDL. Leaving the Epic Action in California while the class actions proceed in Florida invites inconsistency, which Section 1407 exists to avoid. Despite Movants' insistence otherwise, "informal coordination appears inadequate to address the risk of inconsistent rulings in this factually and legally complex litigation." *In re Digital Advert. Antitrust Litig.*, 555 F. Supp. 3d 1372, 1376-77 (J.P.M.L. 2021).

### C. Centralization Brings Efficiencies Even When Some Issues Are Distinct.

Transfer serves "the convenience of parties" and "will promote the just and efficient conduct" of the actions. 28 U.S.C. § 1407(a). Those aims can be served even in the face of the differences in the cases' claims, defenses, or factual applications.

Section 1407 contains no predominance requirement and does not demand class-action-style common issues. In fact, "[t]ransfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Katz Interactive Call Processing Pat. Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007). Individualized issues thus "do not—especially at this early stage of litigation—negate the efficiencies to be gained by centralization." *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017).

1. Nonidentical parties and claims do not eliminate the common evidence.

Movants emphasize that most of the Epic Action's 21 parties do not appear in the patient cases and then ask this Panel to infer that every fact concerning those parties is unique. Mem. 12, 15-17. There are numerous ways in which the actions and conduct of those parties may be relevant to litigation to which they are not parties. For instance, a provider's disclosure may be relevant evidence even if the provider is not a party in every action. Party identity affects obligations, merits adjudication, and distribution of liability; it is not a proxy for *relevance* nor do the cases' different party rosters mean, automatically, that the cases' factual investigations are unique. Moreover, as the Panel noted in its Order, interconnected facts may warrant common proceedings even while the transferee judge permits entity-specific discovery to proceed separately. CTO-1 3-4; *see, e.g.*, *In re MOVEit Customer Data Security Breach Litig.*, 699 F. Supp. 3d 1402, 1405-07 (J.P.M.L. 2023) (coordinating interrelated conduct across different entities rather than requiring identical defendant lineups).

Coordination also does not conscript Movants into the patient cases. Cases transferred into an MDL "ordinarily retain their separate identities," *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015), and coordination "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Home Depot USA, Inc. v.*

*Lafarge N. Am., Inc.*, 59 F.4th 55, 62 (3d Cir. 2023) (quoting *Johnson v. Manhattan R.R. Co.*, 289 U.S. 479, 496-97 (1933)). Movants need not join a patient class, surrender their counsel, or litigate any patient's damages to participate in common discovery about the disclosures they themselves put at issue.

2. <u>The relevant convenience is collective and pretrial.</u>

The existence of California parties, witnesses, and subpoena recipients does not mean that transfer, overall, would be inconvenient and fail to serve efficiency aims. *See* Mem. 15-16. Weighing strongly in favor of transfer, the Panel selected Florida in part because Health Gorilla's principal place of business is in Coral Gables and Judge Moore was already managing the majority of the patient actions. CTO-1 4. A headcount of California-based parties does not clearly outweigh the burden to Health Gorilla for duplicative production or testimony, particularly in a forum that never made sense given the main engine behind the Epic Action (Epic) is from Wisconsin.

Transfer also does not require every California witness to travel to Florida. Section 1407(b) permits the assigned judge to exercise deposition-related powers in other districts; applicable subpoena protections remain relevant, and remote depositions may be ordered or stipulated. 28 U.S.C. § 1407(b); Fed. R. Civ. P. 30(b)(4), 45(c). Centralization simply does not relocate the actual activities of all discovery. On the contrary, centralization allows one court to supervise common work while preserving appropriate witness locations, and independent representation.

Nor is Movants' chosen trial forum automatically displaced because Section 1407 provides for remand at or before the conclusion of pretrial proceedings unless an action has terminated. 28 U.S.C. § 1407(a); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998) (§ 1407 "obligates the Panel to remand any pending case to its originating court when, at the latest, those pretrial proceedings have run their course."). Because "Section 1407(a) calls on the JPML to balance a multitude of competing considerations concerning the benefits and

drawbacks of centralization," the ultimate balance must include the consideration of convenience to other parties and nonparty witnesses, as well the judicial system's interest in avoiding repeated management of the same complex discovery. *Uber Techs., Inc. v. United States Jud. Panel on Multidistrict Litig.*, 131 F.4th 661, 672 (9th Cir. 2025). The fact that Movants first filed in California does not preclude transfer to a Florida court.

3. Existing progress and the GuardDog judgment can be preserved without exempting all remaining discovery.

Movants are concerned that their reported production, subpoenas, protective arrangements, fully briefed motions, and partial resolution should be preserved, though they do not identify how any efforts to date would be wasted. Mem. 20-22. The parties have far from exhausted the relevant common work. The parties have not even begun to negotiate any custodians or search terms for document productions. Existing production is an asset that coordinated proceedings can reuse lawfully, and it does not require separate supervision of all remaining work. "[T]he transferee court may account, at his discretion, for any differences among the actions by using appropriate pretrial devices, such as separate tracks for discovery or motion practice." *In re Digital Advert. Antitrust Litig.*, 555 F. Supp. 3d at 1376. Moreover, to the extent that the Epic Action has progressed further than the patient actions, it can be remanded earlier—although that prospect presupposes that Health Gorilla's motion to dismiss will not be granted or that the case will survive summary judgment when even early discovery has shown that Health Gorilla did not violate any framework rules or engage in the wrongdoing Epic alleges. Movants' argument concerning progress is thus routinely rejected, as it should be here.[5]

---

[5] *See, e.g.*, *In re Katz*, 481 F.Supp. 2d at 1355 ("The Panel is also aware that proceedings in some MDL–1816 actions are further advanced than other actions. It may well be that some actions may be ready for trial in advance of other MDL–1816 actions. If such is the case, nothing in the nature of this Section 1407 centralization will impede the transferee court, whenever it deems appropriate, from recommending Section 1407 remand.").

The GuardDog judgment also is not a reason to vacate the transfer. *See* Mem. 10-11 & n.3 (describing Baker Decl. Ex. 5). The Panel has rejected this argument in similar circumstances. *E.g.*, *In re Nat. Student Mktg. Litig.*, 368 F. Supp. 1311, 1314 (J.P.M.L. 1972) (transferring action although a consent judgment had been entered against one defendant because "[t]he action is still pending against the remaining defendants," and was "an integral part of this litigation"). Health Gorilla does not seek to disturb that judgment or to relitigate any terminated claims. Any actual enforcement-jurisdiction question should be addressed through an appropriate clarification or other lawful case-specific arrangement, not presumed to bar coordination of the entire remaining action. GuardDog's described conduct can remain relevant evidence concerning other actors, without treating its admissions as binding adjudications against other defendants.

**D. Judge Olguin's Rule 42 Ruling Did Not Decide The Panel's Distinct Section 1407 Question, And Rests On An Incomplete Factual Record.**

Movants also raise the threshold argument that Judge Olguin essentially preempted the Panel's Section 1407 question, despite that Judge Olguin never addressed nor had the occasion to decide coordination under the Section 1407 standard of all the pending cases.

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Op. Corp.*, 486 U.S. 800, 816 (1988). The "rule of law" that Judge Olguin decided was whether he should exercise his discretion to "join" or "consolidate" two cases that were pending before the same court in California. Fed. R. Civ. P. 42(a). It was not whether the Epic Action should participate in common pretrial work with an existing multidistrict proceeding. Unlike Rule 42, Section 1407 addresses actions pending in different districts and assigns the nationwide coordination determination to the Panel. 28 U.S.C. § 1407(a), (c).

As applied here, a finding that two cases have different factual circumstances and defenses does not decide whether identified portions of their pretrial work can efficiently be coordinated with a broader group. *In re Pork Antitrust Litigation*, 2021 WL 5310590, at *3 (D. Minn. Nov. 12, 2021), which Movants cite, does not hold that a district court's Rule 42(a) decision should—or, more importantly, can—bind the Panel on a subsequent Section 1407 centralization decision. Even if Rule 42 and Section 1407 serve substantially identical purposes in case management of related cases, Movants cite no case holding that a decision denying a motion under Rule 42(a) prohibits a subsequent decision under Section 1407.

*In re Regents of Univ. of California*, 964 F.2d 1128 (Fed. Cir. 1992), is instructive. The petitioner argued that five earlier district-court decisions bound the Panel. One of those decisions denied a motion to relate two California actions for trial under a local rule because their common elements were insufficient, while assigning their discovery to the same magistrate. The Federal Circuit nevertheless rejected the law-of-the-case objection ***because*** the earlier rulings had not decided whether pretrial work across all five actions should be coordinated under Section 1407, and refusal to relate actions and multidistrict pretrial coordination are different determinations. *Id.* at 1131-33. Here, too, the Panel was not repeating Judge Olguin's task, but rather independently assessing the specific overlap of the Epic Action with all the pending actions.[6]

In fact, far from being unrelated, the Patterson class action complaint itself concedes it is based on Epic's own public allegations—proving that Epic's factual narrative is the very foundation of the MDL it now seeks to avoid.

---

[6] Movants also cite authorities in which there was a true "reversal" of a prior decision, though there would be no true "reversal" here. *Cf., e.g.*, *In re Pharmacy Benefit Managers Antitrust Litigation*, 582 F.3d 432, 438-42 (3d Cir. 2009) (transferee judge's vacatur of an existing order compelling arbitration violated law of the case doctrine).

In any event, even if the law of the case doctrine applied, "the doctrine merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit on their power." *Christianson*, 486 U.S. at 802-03 (concluding that court of appeals "did not exceed its power in revisiting" a jurisdictional issue, "and once it concluded that the prior decision was 'clearly wrong' it was obliged to decline jurisdiction"). The Panel can give Judge Olguin's ruling appropriate weight and still determine that common pretrial work belongs before Judge Moore.

Moreover, as Movants themselves acknowledge, the law of the case doctrine does not apply where "extraordinary circumstances" exist, including "the availability of new evidence." Mem. 15 (citing *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989)). As the Ninth Circuit in *Pyramid Lake* recognized, a district court even has discretion to revisit its prior orders to "correct a clear error," particularly in its review of "undoubtedly a live issue." 882 F.2d at 369 n.5. Since Judge Olguin issued his ruling, what Health Gorilla has learned about Epic's conduct—*i.e.*, its long-held knowledge of the facts underlying its claims about improper record exchanges—fundamentally alters the factual overlap analysis. This new information means the Epic and patient actions will share substantial, overlapping discovery tracks focused on Epic's internal audit logs, system alerts, and executive communications covering that extended window to determine what Epic knew, and when.

Because the factual understanding of this overlap has evolved, and because Rule 42 evaluates local trial management rather than nationwide pretrial efficacy, it is proper for this panel to independently assess the need for centralization under Section 1407.

## CONCLUSION

For the foregoing reasons, the motion to vacate the Conditional Transfer Order should be denied. Health Gorilla respectfully requests that the Panel proceed to transfer *Epic Systems Corp. et al. v. Health Gorilla, Inc., et al.*, No. 2:26-cv-00321 (C.D. Cal.) to the MDL.

Dated: September 22, 2026

*/s/ Adam B. Wolfson*

Adam B. Wolfson
David M. Elihu
Julia Sun Choe
Ryan S. Landes
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
(213) 443-3000
adamwolfson@quinnemanuel.com
davidelihu@quinnemanuel.com
juliachoe@quinnemanuel.com
ryanlandes@quinnemanuel.com

*Attorneys for Health Gorilla, Inc.*